**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                      SAN JOSE DIVISION

11

12   Jill Arbanas,                              NO. C 04-05146 JW

13              Plaintiff,                       **ORDER (1) GRANTING
                                                PLAINTIFF'S MOTION FOR
14      v.                                      SUMMARY JUDGMENT IN
                                                PART, (2) DENYING
15   Metropolitan Life Insurance Company, et al.,   DEFENDANTS' MOTION FOR
                                                SUMMARY JUDGMENT, AND (3)
16              Defendants.                      REMANDING CASE FOR
                                                DETERMINATION OF CLAIM
17                                              FOR LONG-TERM DISABILITY
                                                BENEFITS**
18   _____/

19

20                      **I.  INTRODUCTION**

21        Jill Arbanas ("Plaintiff") brings this action under the Employee Retirement Income Security

22   Act of 1974, as amended, 29 U.S.C. § 1001, *et. seq.* ("ERISA"), seeking long-term disability

23   benefits and related equitable relief.  Plaintiff names Metropolitan Life Insurance Company

24   ("MetLife"), American Express Long Term Disability Benefits Plan, American Express Medical

25   Plan, American Express Life Insurance Plan, and American Express Retirement/Pension Plan as

26   defendants (collectively "Defendants").  Presently before this court are cross-motions for summary

27   judgment.  The Court held a hearing on December 5, 2005.  Upon consideration of the briefs filed to

28   date and the oral arguments of counsel, the Court DENIES Defendants' Motion for Summary

1  Judgment.  The case is remanded to Defendants for determination of Plaintiff's claim for long-term

2  disability benefits in accordance with the findings and conclusions of this Order.

3  **II.  BACKGROUND**

4  Plaintiff began working as a travel counselor for American Express in May of 1989 and

5  continued working there for approximately ten years.  (Pl.'s Mot. for Summ. J., hereinafter "Pl.'s

6  Mot.," Docket Item No. 20, 1:6-10; 3:20-21.)  Plaintiff was a participant in the American Express

7  Long Term Disability Benefit Plan ("Plan"), an employment benefit plan governed by ERISA.  The

8  Plan's disability benefits are funded by a group insurance policy issued by Defendant Metropolitan

9  Life Insurance Company ("MetLife") to American Express, Group Policy No. 35686-G-LTD.

10  MetLife is also the claims administrator for the benefits under the Plan and a Plan fiduciary.  (Defs.'

11  Mot. for Summ. J., hereinafter "Defs.' Mot.," Docket Item No. 21, 1:7-14.)

12  In April of 1998, Plaintiff first experienced pain in her hand, which radiated to her forearm.

13  She visited Dr. Norman Livermore, a board-certified orthopedic surgeon, who found neuritic pain,

14  tingling and numbness.  He diagnosed Plaintiff with Repetitive Strain Injury ("RSI").  Several

15  months later, Dr. Livermore also diagnosed Plaintiff with causalgia and frozen shoulder.  (Pl.'s Mot.

16  at 4:1-8.)  During this period, Dr. Livermore referred Plaintiff to physical therapy and suggested she

17  seek stress management counseling, opining: "it's clear that her work duties and her symptoms are

18  combining to cause stress, which in turn worsens her symptoms."  As a result, Plaintiff soon began

19  treatment with Susan Bucker, a clinical social worker.  (Pl.'s Mot. at 4:12-16.)

20  During 1999 Plaintiff's condition worsened.  Dr. Livermore cited decreased grip strength in

21  Plaintiff's hand, diffuse decreased strength in her wrist and fingers, and decreased sensation.  Due to

22  her condition, Plaintiff stopped working at American Express on March 29, 2000.  (Pl.'s Mot. at

23  4:17-21.)

24  On April 5, 2000, Plaintiff submitted a claim for salary continuation benefits to MetLife.

25  Along with her claim, Plaintiff included Dr. Livermore's completed Attending Physician Statement

26  of Disability ("APS"), a form prepared and requested by MetLife.  Dr. Livermore informed MetLife

27  that Plaintiff suffered from RSI and he did not expect her to fully recover.  He also noted at that time

28  2

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   that Plaintiff had no psychological limitations.  In response, MetLife approved Plaintiff's claim for

2   salary continuation benefits.  (Pl.'s Mot. at 4:24-28, 5:1-7.)

3       Plaintiff subsequently sought Myofascial Therapy from Eugene R. Sage, C.M.T.  In a

4   progress report dated May 12, 2000, after Plaintiff had received six treatments, Sage indicated that

5   Plaintiff's pain level was reduced 20-25% from its all-time high and the myofascial tissue had

6   softened and loosened approximately 40%.  Sage also indicated that after the completion of the

7   remaining 12 sessions, Plaintiff would probably be able to return to work on a limited basis.

8   (Defendants' Motion for Summary Judgment, hereinafter "Defs.' Mot.," Docket Item No. 21, 10:16-

9   19.)

10      In July of 2000, Plaintiff informed MetLife during a telephone call that there were

11  psychological issues that would affect her ability to return to work.  She stated she was afraid and

12  anxious about her inability to return to her old job.  Plaintiff submitted a report from Ms. Bucker

13  dated August 1, 2000, which noted Plaintiff's "injury at work" as the "precipitating event for this

14  depression."  (Pl.'s Mot. at 5:8-13.)

15      Plaintiff subsequently applied for long term disability ("LTD") benefits from MetLife.  In her

16  claim form, Plaintiff stated that she was unable to work due to constant pain and an inability to

17  motivate herself or feel interest or enthusiasm for anything.  She also stated that her medication

18  made her "spacy" and "forgetful."  On September 28, 2000, Plaintiff submitted MetLife's APS form,

19  completed by Dr. Livermore.  The APS indicated that Plaintiff suffered from neuritis with left arm

20  pain and frozen left shoulder, listing subjective symptoms and objective findings in the appropriate

21  portions of the form.  Dr. Livermore noted that Plaintiff was in psychotherapy and that she had

22  "class 3" psychological limitations, meaning she was able to engage in only limited stress or

23  interpersonal situations.  Dr. Livermore recommended that Plaintiff undergo nerve tension therapy

24  for her left arm pain and psychotherapy for depression.  He also opined that Plaintiff was unable to

25  perform her occupation due to severe pain and could probably not return to her former job.

26  Additionally, Dr. Livermore completed MetLife's Physical Capacities Evaluation form ("PCE"),

27  listing Plaintiff's physical limitations and her inability to use her left arm.

28

3

**United States District Court**
For the Northern District of California

1    On October 27, 2000, MetLife approved Plaintiff's claim for LTD benefits, effective

2    September 30, 2000, and informed her of the definitions of total disability for which she was

3    approved under the plan.  According to MetLife's letter, Plaintiff would continue to be "totally

4    disabled" during the first two years of her benefits if she was "unable to perform. . .[her] *own*

5    occupation due to a medically determined physical or mental impairment caused by sickness,

6    disease, injury, or pregnancy." *(*Emphasis added.)  The letter stated that the medical information

7    currently on file substantiated Plaintiff's inability to perform her occupation.  Additionally, the letter

8    provided:  "To receive benefits after the first two years of benefits...your disability must prevent you

9    from engaging in each of the material duties of *any* gainful work or service. . . ." (Emphasis added*.*)

10   There was no mention of the "mental illness" limitation in MetLife's letter.  (Pl.'s Mot. at 5-6;

11   Defs.' Mot. at 4-5; MET 00632.)

12       In February of 2001, MetLife requested updated medical information from Plaintiff.  In

13   response to those requests, Plaintiff sent another APS form completed by Dr. Livermore in March of

14   2001, indicating that her diagnosis continued to be neuritis with left arm pain and frozen shoulder.

15   (Defs.' Mot. at 5:14-17; Pl.'s Mot. at 6:13-17.)

16       Plaintiff continued to receive benefits without incident, pursuant to MetLife's October 20,

17   2000 letter.  On March 12, 2002, MetLife informed Plaintiff that in order to continue receiving

18   benefits after the original two year period, ending on September 30, 2002, she must be disabled from

19   "any occupation" instead of from doing her "own occupation."  There was again no mention of the

20   "mental illness" limitation in MetLife's letter.  On March 22, 2002, MetLife requested updated

21   medical information from Plaintiff.  In response to these requests, Dr. Livermore submitted APS

22   forms that listed essentially the same physical and psychological limitations as before.  However, in

23   this submission he elevated Plaintiff's psychological limitations to "class 4," meaning she was

24   "unable to engage in stress situations or engage in interpersonal relations."  (Pl.'s Mot. at 6:20-28;

25   7:1-3.)

26       On April 22, 2002, MetLife informed Plaintiff that it was reviewing her claim in connection

27   with the change in the policy's disability definition as per its March 12, 2002 letter, but provided no

28                                                        4

1    further explanations to Plaintiff. (Defs.' Mot at 5:20-24; 6:21-25.)  A few days later, Ms. Bucker

2    informed MetLife of Plaintiff's physical and psychological limitations, and stated that Plaintiff

3    suffered from "severe depression."  (Pl.'s Mot. at 7:4-7.)

4        While MetLife was reviewing Plaintiff's eligibility for benefits under the "any occupation"

5    definition, it assisted her in gaining Social Security benefits approval.  Under the Plan, MetLife was

6    allowed to reduce Plaintiff's benefits by the amount she received from Social Security.  (Plaintiff's

7    Opposition to Defendants' Motion for Summary Judgment, hereinafter "Pl.'s Opp'n," Docket Item

8    No. 23, 4:25-28; 5:1-8.)  Plaintiff was granted Social Security benefits on September 10, 2002.[1]  The

9    administrative law judge ("ALJ") found that Plaintiff had "severe impairments" of "repetitive strain

10   injury, left arm" and "major depressive disorder."  The ALJ further found that Plaintiff's depressive

11   disorder was an "outgrowth of her physical impairments."  (Pl.'s Mot. at 7:8-13.)

12       On October 7, 2002, MetLife approved payment of benefits to Plaintiff under the "any

13   occupation" definition, informing Plaintiff for the first time that it was because of her "mental

14   nervous condition."  MetLife also stated that benefits under this definition had a 24-month

15   limitation, which would end on September 30, 2004 because her primary diagnosis effective

16   September 30, 2002 was depression.  MetLife provided no further explanation.  (Pl.'s Mot. at 8:16-

17   20.)

18       In November of 2002, MetLife requested additional medical information from Plaintiff.   At

19   various times throughout November and December, Plaintiff provided to MetLife reports and

20   records from doctors other than her primary treating physician. Reports from Ms. Bucker, Dr.

21   Michael Levin, Dr. Vaschetto, and Dr. Fong each addressed Plaintiff's depression.  In particular, Dr.

22   Vaschetto, a psychiatrist, had diagnosed Plaintiff as bipolar with hypochondria.  (Defs.' Mot. at 6-7.)

23       On February 11, 2003, MetLife once again informed Plaintiff of her 24-month limitation

24   under the mental illness definition.  Additionally, MetLife stated that Plaintiff's benefits had been

25   paid under the mental illness limitation since April 24, 2002, and therefore benefits would end 24

26   ─────────────────

27   [1]A Social Security appeals council later asked the ALJ to revisit his decision, but the ALJ
     upheld his ruling in September of 2003 (see page 6).

28                                                    5

United States District Court
For the Northern District of California

1  months from that date, on April 24, 2004.  As a result, Plaintiff's benefit termination date was

2  advanced five months, from September 30, 2004 to April 24, 2004, with no further explanation.

3  (Pl.'s Mot. at 7-8.)  In the same letter, MetLife also asked plaintiff for evidence of a "physical

4  condition" that would prevent her from working in "any occupation," but did not explain why.  (Pl.'s

5  Opp'n at 5:18-29; MET 00495.)

6      In July of 2003, MetLife requested updated medical information from Plaintiff in the form of

7  an "activities of daily living" questionnaire.  Plaintiff's response on the questionnaire was that she

8  had "constant severe pain" in her left arm, shoulder, neck, and left side of her head.  In her

9  questionnaire answers, Plaintiff informed MetLife that she had severe depression and insomnia.

10  Plaintiff also stated on the questionnaire that her husband did all the housework and prepared all the

11  meals, and that some days she did not get out of bed due to her condition.  (Pl.'s Mot. at 8:3-8.)

12      In August of 2003, Plaintiff provided MetLife with updated notes from Dr. Vaschetto

13  regarding Plaintiff's condition.  Dr. Livermore also submitted another APS form, which contained

14  the same opinions and findings as prior submissions.  He stated that Plaintiff could not return to

15  work in any capacity due to her pain and he did not expect any improvement.  (Pl.'s Mot. at 8:9-11.)

16      In September of 2003, Dr. Bucker provided MetLife with medical notes, indicating

17  Plaintiff's pain and depression, and noting that plaintiff's "pain/injury" was a precipitating event for

18  her depression.  Significantly, at this time, Plaintiff also was involved in efforts to retain benefits

19  awarded by the Social Security Administration.  The Social Security council had questioned

20  Plaintiff's award, and MetLife was instrumental in assisting and directing Plaintiff's successful

21  retention of that award.  In doing so, MetLife was aware of the interconnection between Plaintiff's

22  physical complaints and her depressive condition.  The ALJ noted that "the severity of claimant's

23  depressive disorder" met Social Security criteria "because of the interaction between pain and

24  depression." He further noted a "very important connection between the claimant's chronic pain and

25  the onset of her severe depression." (Pl.'s Opp'n at 6:3-8.)

26      On February 10, 2004, pursuant to MetLife's request, Dr. Livermore sent MetLife an

27  updated APS form, listing the same physical and psychological observations as prior submissions,

28

**United States District Court**
For the Northern District of California

1  and diagnosing Plaintiff with causalgia.  Specifically, Dr. Livermore informed MetLife that because

2  of Plaintiff's pain, she could only sit and stand one hour per day, and walk for four hours per day,

3  intermittently.  He further informed MetLife that Plaintiff could not lift or carry any weight, and that

4  she could perform no repetitive motions with her left hand at all.  Dr. Livermore completed a

5  Functional Capability Assessment form at the same time, repeating these limitations.  In response to

6  MetLife's questions on the form, Dr. Livermore responded that an "in-depth evaluation" of

7  Plaintiff's "functional abilities" would not be beneficial, and added, "[S]he is obviously disabled."

8  (Pl.'s Opp'n at 6:18-28.)  On March 4, 2004, Plaintiff also responded to MetLife's request for

9  updated medical information by providing another "activities of daily living" questionnaire, showing

10  that her condition and activities had not changed.  (Pl.'s Mot. at 8:20-28.)

11        On March 9, 2004, MetLife sent Plaintiff a letter in response to Dr. Livermore's February

12  submission, informing Plaintiff that a nurse had reviewed the reports and found them "insufficient"

13  for MetLife to continue paying benefits "based on a physical condition."  As a result, MetLife told

14  Plaintiff that her benefits would be terminated on April 24, 2004, the date provided in their February

15  11, 2003 letter.  (Pl.'s Mot. at 9:3-7.)

16        On July 19, 2004, Plaintiff appealed MetLife's denial of her claim for benefits.  In

17  September, Plaintiff sent additional medical records to MetLife.  Plaintiff's counsel also informed

18  MetLife that their denial based on the 24-month "mental illness" limitation was incorrect because

19  the evidence in the record demonstrated the physiological nature of Plaintiff's disability.  MetLife

20  subsequently referred Plaintiff's file to Dr. Phillip Jordan Marion, a physical

21  medicine/rehabilitation/pain management specialist, for Independent Physician Review.  (Pl.'s Mot.

22  at 9:8-15.)

23        On November 11, 2004, Dr. Marion sent a letter regarding his review of the file.  (Plaintiff's

24  Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment, hereinafter "Pl.'s

25  Reply to Defs.' Opp'n," Docket Item No. 25, 8:4-6;  Defendants' Opposition to Plaintiff's Motion

26  for Summary Judgment, hereinafter "Defs.' Opp'n.," Docket Item No. 24-1, 9.)  Dr. Marion focused

27  "on Plaintiff's physical injury, but did not review Plaintiff's file to determine whether there was a

28
                                        7

connection between her depression and her alleged physical injury." Dr. Marion found that the evidence supported a "generalized nonspecific diagnosis of left upper extremity pain and neuritis," but he found "no objective impairment based on physical examination of diagnostic radiological or electrodiagnostic studies." Dr. Marion further stated that Dr. Livermore's diagnosis was "not supported by any objective impairment..." and Plaintiff was not precluded from performing sedentary to light job duties as of April 25, 2004. He also found that Plaintiff was "reportedly independent" in her activities of daily living. (Pl.'s Mot. at 9:3-28.)

On November 16, 2004, MetLife upheld its previous termination of Plaintiff's LTD benefits. In addition, MetLife stated that Plaintiff's 24-month mental/nervous limitation had been reached on September 29, 2002, rather than the previously given termination dates of September 30, 2004 or April 24, 2004. (Pl.'s Mot. at 10:1-6.)

Following the second denial, Plaintiff commenced this action claiming wrongful denial of benefits and seeking equitable relief. (Pl.'s Mot. at 10:1-6; Complaint, Docket Item No. 1.) The parties filed cross-motions for Summary Judgment on October 31, 2005. Plaintiff moves for summary judgment on the grounds that Defendants wrongfully terminated her long-term disability benefits. Plaintiff contends (1) The Plan's "mental illness" limitation is ambiguous and should therefore be construed against MetLife; (2) The standard of review in this case should be de novo; and (3) MetLife's termination of Plaintiff's claim for LTD benefits was erroneous thereby entitling her to the appropriate equitable relief. Defendants move for summary judgment on the basis that their decision to terminate Plaintiff's claim for benefits was correct and, in any event, must be afforded due deference by this Court and cannot be set aside unless found to be "arbitrary and capricious." Defendants contend (1) MetLife has full discretionary authority under the plan and therefore the abuse of discretion standard of review applies in this case; and (2) MetLife properly terminated Plaintiff's claim for LTD benefits.

//

United States District Court
For the Northern District of California

### III.  PLAN PROVISIONS

The following plan terms are relevant to this action:

**Definition of Total Disability** –

You are considered totally disabled and eligible to apply for LTD Benefit Plan benefits if, during the six month waiting period and the first two years that benefits are payable, you are unable to perform any and every duty of your own occupation due to a medically determined physical or mental impairment caused by your sickness, disease, injury, or pregnancy.  You must require the regular care and attendance of a doctor.  A "doctor" is a person who is legally licensed to practice medicine.  A licensed medical practitioner will be considered a doctor if applicable state law requires that such practitioners be recognized for the purposes of disability certification and the care and treatment provided by the practitioner is within the scope of his/her license...

To receive benefits after the first two years that benefits are payable, you must be under the care and attendance of a licensed physician and your disability must prevent you from engaging in each of the material duties of any gainful work or service for which you are reasonably qualified, taking into consideration your training, education, experience and past earnings (except rehabilitative employment). [MET 00933].

\*\*\*

**Mental Illness** –

If you are disabled due to mental illness, benefits are limited to 24 months if treatment is rendered on an outpatient basis.

If you do not return to work at the end of the 24 month period...your LTD coverage will end.  Mental illness is defined as a mental, emotional or nervous condition of any kind. [MET 00934, 01004].

\*\*\*

**When LTD Benefits End** –

LTD benefits will end on:

•       The date you are no longer disabled as defined by the Plan,
•       The date you are no longer under the care of a doctor, or
•       The date of your death....

With regard to mental illness-related disabilities...if you do not return to work at the end of the 24-month period...your LTD coverage will end. [MET 00934, 00936].

\*\*\*

9

**Claim Processing Services**

**Disability Benefits:** With respect to disability benefits Claim processing:

> 1. Delegation of Authority: American Express and MetLife acknowledge that American Express has delegated to MetLife and MetLife has agreed to assume responsibility and discretionary authority for determining eligibility for disability benefits in accordance with the Plan terms.

**Claim Review Procedure:**

> 1. American Express and MetLife acknowledge that American Express has delegated to MetLife and MetLife has agreed to assume the responsibility and discretionary authority for providing the full and fair review of determinations concerning eligibility for Plan Benefits and the interpretation of Plan terms in connection with the appeal of Claims denied in whole or in part.  Any determination or interpretation made by MetLife pursuant to this discretionary authority shall be given full force and effect and be binding on the Participant and American Express, subject to American Express' right under Plan Benefits Litigation unless it is demonstrated that the determination was arbitrary and capricious. [MET 01065].

# IV.  STANDARDS

**A.**     **Standard of Review for Summary Judgment.**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses."  Celotex v. Catrett, 477 U.S. 317, 323-324 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  Id. at 323.  If this burden is met, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element with respect to which the non-moving party bears the burden of proof at trial.  Id. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The non-moving party cannot defeat the moving party's properly

10

United States District Court

For the Northern District of California

1   supported motion for summary judgment simply by alleging some factual dispute between the

2   parties.  To preclude the entry of summary judgment, the non-moving party must bring forth

3   material facts,  i.e., "facts that might affect the outcome of the suit under the governing law  . . .

4   Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby,

5   Inc., 477 U.S. 242, 247-48 (1986).  The opposing party "must do more than simply show that there

6   is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio,

7   475 U.S. 574, 586 (1986).

8        The court must draw all reasonable inferences in favor of the non-moving party, including

9   questions of credibility and of the weight to be accorded particular evidence. Masson v. New

10  Yorker Magazine, Inc., 501 U.S. 496, 520 (1991) (citing Anderson, 477 U.S. at 255); Matsushita,

11  475 U.S. at 588;  T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 630 (9th Cir. 1987).  It is

12  the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party,

13  coupled with undisputed background or contextual facts, are such that a rational or reasonable jury

14  might return a verdict in its favor based on that evidence." T.W. Elec. Serv., 809 F.2d at 631.

15  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the

16  evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson,

17  477 U.S. at 248.  However, "[w]here the record taken as a whole could not lead a rational trier of

18  fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at

19  587.

20  **B.      Standard of Review for Denial of Benefits.**

21       A denial of benefits challenged under ERISA is reviewed under a de novo standard unless

22  the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or

23  to construe the terms of the plan. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

24  The default is that the administrator has no discretion, and the administrator has to show that the

25  plan gives it discretionary authority in order to get any judicial deference to its decision. Kearney v.

26  Standard Ins. Co., 175 F.3d 1084, 1089 (9th Cir. 1999).  The presumption of de novo review can be

27  overcome only when a plan's reservation of discretion is unambiguous. McDaniel v. Chevron Corp.,

28
                                      11

203 F.3d 1099, 1107 (9th Cir. 2000).  Where the benefit plan does give the administrator such discretion, a deferential standard of review is appropriate.  Firestone Tire & Rubber Co., 489 U.S. at 111.  The deferential standard of review is referred to interchangeably as "abuse of discretion" or "arbitrary and capricious," both of which have the same meaning in this context.  Hensley v. Northwest Permanente P.C. Ret. Plan & Trust, 258 F.3d 986, 994 n. 4 (9th Cir. 2001).

## V.  DISCUSSION

**A.**      **Standard of review for denial of Plaintiff's benefits.**

A district court faced with a motion for summary judgment reviewing a plan administrator's determination must first determine the proper standard of review.  Kearney, 175. F.3d 1084.  If the standard of review in the case is de novo, then a reviewing court should follow the summary judgment standard outlined in the general standards, and may then decide the case by summary judgment only if there are no genuine issues of material fact in dispute.  If, however, the standard of review is abuse of discretion, the court may not review or consider any evidence not submitted to the administrator, and the court's role is limited to determining if the decision was supported by evidence in the administrative record.  See Taft v. Equitable Life Assurance Soc., 9 F.3d 1469, 1472 (9th Cir. 1993).

In this case, the Court must first determine whether the Plan grants MetLife discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  Firestone, 489 U.S. at 109.  The summary plan description provides that "the Plan administrator shall have all powers and discretion necessary to administer the Plans, including, without limitation, the power to . .. delegate fiduciary duties on claim determinations."  (MET 00983.)  Further, the Plan states, "American Express has delegated to certain claims administrators the discretionary authority and fiduciary responsibility under ERISA to make claim determinations and to provide a full and fair review of appealed claims including determining any final appeals of claims.  These claims administrators are known as claims fiduciaries as listed in Plan Facts. . . .  Claims fiduciaries decisions are conclusive and binding on all parties and are not subject to review."  (MET 00989.) The "Plan Facts" section lists MetLife as the insurer/claims administrator and claims fiduciary.

12

(MET 00994.)  Finally, the summary plan description states, "For each insured plan, program or option the insurance company will have the sole authority, discretion and responsibility to interpret and apply the terms of the plan, program or option, including entitlement to benefits and the amount of benefit to be paid under the insurance contract, if any."  (MET 00990.)  The Court finds this delegation of authority conferred discretionary authority on MetLife.

However, as the Supreme Court has recognized, even when a plan provides discretionary authority, an additional factor to consider in determining the standard of review is to examine the potential for a conflict of interest.  Firestone, 489 U.S. at 115.  If the same party serves as plan administrator and funds the plan from its general assets, then an apparent conflict exists.  Friedrich v. Intel Corp., 181 F.3d 1105, 1109 (9th Cir. 1999).  This consideration is particularly applicable when a Plan is funded by an insurance policy.  "Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business."  Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc., 125 F.3d 794, 797-98 (9th Cir. 1997), (citing Brown v. Blue Cross & Blue Shield of Alabama, Inc., 898 F.2d 1556, 1564 (11th Cir. 1990)).  The Plan's disability benefits in this case are funded by a group insurance policy that is issued and administered by MetLife. (Defs.' Mot. at 1:7-14.)  Due to MetLife's role as both the administrator and the funding source for the Plan, there is an apparent conflict of interest.

Once a threshold showing of such a conflict is made, a plaintiff bears the initial burden of providing "material, probative evidence, beyond the mere fact of apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary."  See Atwood v. Newmont Gold Co., 45 F.3d 1317, 1322  (9th Cir. 1995).  If the plaintiff does not meet this burden, then the court applies the traditional abuse of discretion review. Id. at 1323.  On the other hand, if the plaintiff satisfies that burden, the fiduciary or plan administrator must rebut the presumption by producing evidence to show that the conflict of interest did not impact its decision to terminate benefits.  Id. If the plan fails to carry that burden, the

13

United States District Court

For the Northern District of California

1   administrator's decision will be reviewed de novo, without deference to its exercise of discretion.

2   Id.

3          Plaintiff proffers the following factors as "material, probative evidence" tending to show that

4   MetLife's alleged self-interest impacted their decision to terminate her benefits: (1) MetLife's

5   "moving target" benefit end date; (2) MetLife's referral of Plaintiff's file to an unqualified

6   physician; (3) MetLife's total acceptance of Dr. Marion's flawed report; (4) MetLife's requirement

7   of "objective evidence" despite no corresponding policy provision; (5) MetLife's failure to take into

8   consideration Plaintiff's complaints of pain; and (6) MetLife's failure to credit Plaintiff's treating

9   physician.  (Pl.'s Mot. at 13-18.)

10         Plaintiff contends that MetLife provided her with three different benefit termination dates;

11  each one sooner than the one previously cited.  Plaintiff argues that this is evidence showing

12  MetLife acted under a conflict of interest.  Defendants admit that MetLife provided different benefit

13  termination dates to Plaintiff, but contend that there is no conflict of interest.  (Pl.'s Reply to Defs.'

14  Opp'n at 7:2-5.)

15         In analyzing whether evidence of a conflict of interest can be shown, the Ninth Circuit has

16  focused on inconsistencies in an administrator's reasons for terminating benefits.  See Lang, 125

17  F.3d at 798.  For instance, in Lang, the administrator originally gave one reason for terminating

18  benefits but, at a later point, changed its position and attempted to justify its denial of benefits on

19  different reasons. 125 F.3d at 799.  The court in Lang also cited an Eleventh Circuit case as

20  guidance, in which an administrator originally denied payments and then changed its position to

21  allow payments on the basis of no new evidence.  125 F.3d at 798 (citing Brown v. Blue Cross &

22  Blue Shield of Alabama, Inc., 898 F.2d 1556 (11th Cir. 1990)).  In both of these instances, the courts

23  concluded that such inconsistencies are sufficient to satisfy a plaintiff's threshold requirement and

24  shift the burden to the administrator. 125 F.3d at 798-99.

25         In this case, MetLife informed Plaintiff on October 7, 2002 that her benefits would end on

26  **September 30, 2004**, because the medical reports it received from her doctor and social security

27  allegedly stated that Plaintiff's primary diagnosis effective September 30, 2002 was depression.

28                                        14

United States District Court

For the Northern District of California

(Pl.'s Reply to Defs.' Opp'n at 7:2-5.)  Several months later, and without any warning, MetLife informed Plaintiff that it was advancing her benefit termination date to **April 24, 2004** because her LTD benefits "under the mental and nervous provision began on April 24, 2002."  As a result, Plaintiff's benefit termination date was advanced five months, with no discussion by MetLife as to its reasons or calculations.  (Pl.'s Reply to Defs.' Opp'n at 7:2-5.)

 Defendants contend that Plaintiff's benefits under the mental provision began in April of 2002 because that was the first date they received significant evidence pertaining to Plaintiff's depression. (Defs.' Opp'n at 9:7-8.)  Yet six months after receiving such evidence, MetLife gave Plaintiff a two-year benefit end date of September 2004, not April 2004.  (Pl.'s Reply to Defs.' Opp'n at 7:7-12.)  If MetLife had truly believed that Plaintiff's effective date of depression was April 24, 2002, as it later contended, it should have known this and informed her of the same when it prepared its October 7, 2002 letter.  MetLife's change in applying the Plan's mental illness limitation to Plaintiff was based on no new evidence and resulted in an earlier termination date. Therefore, this case parallels the examples of inconsistencies cited in <u>Lang</u>.  <u>See</u> 125 F.3d at 798-99.

 In addition to those inconsistencies, MetLife informed Plaintiff, in its November 16, 2004 letter denying Plaintiff's appeal, that the mental illness limitation for her benefits actually began on September 29, 2000 and consequently expired on **September 29, 2002**.  Once again, MetLife failed to provide any explanation for the new date.  (Pl.'s Mot. at 13:20-24.)  This third benefit termination date is directly contradicted by MetLife's prior letters—specifically its original benefit approval letter to Plaintiff on October 7, 2000.  Defendants correctly contend that Plaintiff's initial claim for LTD benefits was for a physical disability.  (Defs.' Opp'n at 9:6-7.)  However, MetLife offers no explanation for the paradox that four years after approving Plaintiff's claim based on physical disability, it determined, in denying Plaintiff's appeal, that her benefits under the mental illness limitation had actually begun prior to its original approval letter for physical disability.

 MetLife also contends that because the actual payment of Plaintiff's benefits extended past the third termination date without resulting in harm to Plaintiff, its change in position is not evidence

15

1   of a conflict of interest.  Nevertheless, an inconsistency which does not appear to directly harm the

2   Plaintiff may still suffice as evidence of a conflict.  See Lang, 125 F.3d at 798.  In Brown, although

3   the defendants' change in position, based on no new evidence, actually resulted in approval of

4   plaintiff's previously denied payment, the court still held that inconsistency to be indicative of

5   tainted self-interest.  Lang, 125 F.3d at 798 (citing Brown, 898 F.2d at 1569).  In this case,

6   MetLife's change in categorizing Plaintiff's disability was based on no new evidence, and was used

7   as justification in denying her appeal.  Therefore, the Court finds the lack of valid explanations or

8   reasons for each of Defendants' inconsistencies constitute sufficient material probative evidence that

9   MetLife's decision was tainted by self-interest.

10      Since Plaintiff has met her initial burden, the burden shifts to Defendants to show that

11   MetLife's decision was in fact in furtherance of its fiduciary responsibilities, and the conflict of

12   interest did not impact its decision.  See Atwood v. Newmont Gold Co., 45 F.3d at 1323.  If the Plan

13   fails to carry that burden, the administrator's decision will be reviewed de novo, without deference

14   to its exercise of discretion.  Id.  In Lang, the court provided that the defendant's rebuttal would be

15   sufficient "if the plan could show how its decision in fact benefitted the plan as a whole and

16   therefore the rest of the beneficiaries under the plan."  125 F.3d at 798.

17      Defendants' explanations for their inconsistent reasoning are insufficient.  The only

18   additional justification offered by Defendants is that MetLife did not terminate Plaintiff's benefits as

19   early as it could have.  This does not address the question of whether MetLife's decision was

20   intended to further its duties to other fiduciaries under the plan, and it is insufficient to satisfy

21   Defendants' burden in response to Plaintiff's contentions of a conflict of interest.  Because the Court

22   finds Defendants' moving target benefit end date sufficient to show inconsistencies in light of the

23   apparent conflict, the Court need not address Plaintiff's other contentions in this section.

24   Accordingly,  MetLife's decision to terminate benefits is not entitled to deference and is subject to

25   de novo review.

26   //

27

28                                                          16

**B.      Ambiguity in policy language.**

Plaintiff contends that the Plan's "mental illness" limitation is ambiguous and should therefore be construed against MetLife under de novo review.   Defendants counter that because MetLife was granted discretion to interpret the terms of the Plan, its interpretation of the Plan's terms should stand, absent a showing that MetLife's construction conflicts with the Plan's language. (Pl.'s Mot. at 10; Defs.' Reply to Pl.'s Opp'n at 7:2-4.)

As an initial matter, the Ninth Circuit has held that when determining ambiguity of plan provisions, the review is de novo even if the Plan administrator has discretion over interpreting such provisions.  Winters v. Costco Wholesale Corp., 49 F.3d 550, 552-553 (9th Cir. 1995) (citing Patterson v. Hughes Aircraft Co., 11 F.3d 948, 950 (9th Cir. 1993)).

The 24-month "mental illness" limitation in the Plan defines "mental illness" as a "mental, emotional or nervous condition of any kind."  The Plan's definition of the term presents an almost identical definition to those found ambiguous in a series of Ninth Circuit cases.  See Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534 (9th Cir. 1990);  Patterson, 11 F.3d 948; Lang, 125 F.3d 794 (9th Cir. 1997).  All three cases, Kunin, Patterson, and Lang, considered the term "mental illness" as defined by those plans and held that it was ambiguous because it could reasonably refer to either (1) illnesses with non-physical causes; or (2) illnesses with physical causes, but exhibiting both physical and non-physical symptoms.  In this case, the Plan does not specify whether a disability is to be classified as "mental" by looking to the cause of the disability or to its symptoms, nor does it make clear whether a disability qualifies as a "mental condition" when it results from a combination of physical and mental factors.  Accordingly, the Court finds that the "mental illness" limitation in the Plan is ambiguous.

In ordinary insurance contracts, ambiguities are construed against the insurance company, under the doctrine of *contra proferentem*.  Kunin, 910 F.2d at 538-39.  The doctrine of *contra proferentem* is based on the principle of contract construction that when one party is responsible for the drafting of an instrument, any ambiguity will be resolved against the drafter.  Winters, 49 F.3d at 554.  Applying the doctrine of *contra proferentem* to the this case requires that the ambiguous

United States District Court
For the Northern District of California

17

"mental illness" definition must be interpreted in Plaintiff's favor.  This requires the Court to adopt the reasonable interpretation advanced by Plaintiff:  that the phrase "mental illness" does not include "mental" conditions resulting from "physical" disorders.

Because the Plan is insured by MetLife, the Court may construe the Plan in accordance with the rules normally applied to insurance policies.  Furthermore, regardless of the standard of any discretionary language in the policy, the rule of *contra proferentem* would still be applied.  Defendants contends that the holding in <u>Winters v. Costco Wholesale Corp.</u> is controlling.  However, <u>Winters'</u> proposition, that the doctrine of *contra proferentem* does not apply to self-funded ERISA plans where discretion is granted, is distinguishable from this case.  Here, the Plan in question is an insured plan, not a self-funded plan.  Accordingly, because this Plan is an insurance policy, it is governed by unpreempted California insurance law, which provides that ambiguous insurance policies must be construed in favor of the insured.  <u>See</u> <u>Kunin</u>, 910 F.2d at 538-39 <u>and</u> <u>Ely v. Boeing Co.</u>, 945 F.2d 276, 279-80 (9th Cir. 1991).

**C.      Plaintiff's exhaustion of her administrative remedies.**

Defendants contend that Plaintiff failed to properly exhaust her administrative remedies under ERISA on the issue of comorbidity and thus her claims in this case are barred.  (Defs.' Opp'n at 4-5).  Plaintiff contends that she filed a timely appeal and properly exhausted all of her administrative remedies.  (Pl.'s Reply to Defs.' Opp'n at 4).

Under ERISA, a claimant is required to exhaust a plan's administrative remedies prior to filing suit in federal court.  <u>Amato v. Bernard</u>, 618 F.2d 559, 556-68 (9th Cir. 1980).  Federal courts should usually enforce this exhaustion requirement as a matter of sound policy.  <u>Id</u>. at 568.  In this case, MetLife informed Plaintiff that her benefits were being terminated under the "mental illness" limitation in the policy.  Plaintiff timely appealed that decision, contending that the "mental illness" limitation did not apply to her.  MetLife rejected Plaintiff's contention, upholding its earlier decision on appeal, and informed Plaintiff that she had exhausted her administrative remedies.  (Pl.'s Reply to Defs.' Opp'n at 3:4-16; MET 00516).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Defendants contend that Plaintiff's claims are barred because she premised her appeal on the

2    claim that "her disability was caused by a physical condition, not a mental nervous condition

3    combined with a physical condition." (Pl.'s Reply to Defs.' Opp'n at 2:9-13.) Plaintiff's position

4    has consistently been that she is disabled due to a physiological injury which has resulted in both

5    physical and mental symptoms, including severe depression. (Pl.'s Reply to Defs.' Opp'n at 2:18-

6    21.) Plaintiff's appeal stated that the "mental illness" limitation did not apply to her. Neither the

7    Plan documents nor MetLife's letters to Plaintiff required greater specificity in Plaintiff's appeal.

8    With respect to the manner and content of notification of benefit determinations, 29 C.F.R. §

9    2560.503-1(g) states:

10       (1) Except as provided in paragraph (g)(2) of this section, the plan administrator
         shall provide a claimant with written or electronic notification of any adverse
11       benefit determination. Any electronic notification shall comply with the
         standards imposed by 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv). The
12       notification shall set forth, in a manner calculated to be understood by the
         claimant --
13
         (i) The specific reason or reasons for the adverse determination;
14
         (ii) Reference to the specific plan provisions on which the determination is based;
15
         (iii) A description of any additional material or information necessary for the
16       claimant to perfect the claim and an explanation of why such material or
         information is necessary;
17

18       By its terms, the statutory language of 29 C.F.R. § 2560.503-1(g) places the burden of raising

19   the appropriate claim denial issues on the claim administrator, not the claimant. Thus, Defendants'

20   argument is contrary to the claims procedure regulation itself. (Pl.'s Reply to Defs.' Opp'n at 3:8-

21   10; 29 C.F.R. § 2560.503-1(g)). If Defendants had found Plaintiff's appeal lacking, it was their

22   responsibility to inform Plaintiff so that she could perfect her claim. Defendants did not do so and,

23   therefore, Plaintiff's appeal was sufficient.

24       Furthermore, Defendants incorrectly rely on Pengilly v. Guardian Life Ins. Co. of America to

25   support their argument that Plaintiff's appeal was insufficient. 81 F. Supp. 2d 1010 (N.D. Cal.

26   2000). The court in Pengilly found that the plaintiff had not exhausted his administrative remedies

27   regarding the denial of his benefits because he had only timely appealed the defendant's method of

28                                                      19

calculation, not the substantive termination decision itself.  In contrast, Plaintiff's appeal here was specifically directed at the applicability of the "mental illness" limitation in the termination of her benefits, which is the substance of her current claim.  There is no dispute that Plaintiff's appeal was timely and that her appeal was directed specifically at the applicability of the mental illness limitation.  Therefore, the Court finds that Plaintiff properly exhausted her administrative remedies.

**D.     MetLife's decision to terminate Plaintiff's LTD benefits.**

Defendants contend that MetLife's decision to terminate Plaintiff's claim for benefits should be afforded due deference pursuant to the Plan's grant of discretion.  As determined above, however, MetLife is no longer entitled to such deference under de novo review.  Accordingly, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-324 (1986).

Resolving the ambiguous term in Plaintiff's favor does not dispose of all remaining issues of fact in this case.  Even if the Plan's term is interpreted as described above, there remains the question of whether MetLife's denial of benefits was supported by medical evidence.  Plaintiff contends that her arm injury was a primary contributing factor to her depression. Thus, according to Plaintiff, the "mental illness" limitation in the Plan does not apply because her disability is not solely "mental" in nature.  (Pl.'s Mot. at 20:3-6.)  Plaintiff further contends that MetLife erred in terminating her benefits because MetLife (1) referred Plaintiff's file to an unqualified physician; (2) accepted the flawed report of MetLife's Independent Medical Reviewer; (3) required "objective evidence" despite no corresponding policy provision; (4) failed to take into consideration Plaintiff's complaints of pain; and (5) failed to credit Plaintiff's treating physician. (Pl.'s Mot.)

The record indicates that Plaintiff's doctors found her "mental" condition stems from the physical disability for which her LTD benefits were originally approved.  However, because MetLife failed to construe the ambiguity in favor of the insured, the Independent Medical Reviewer

20

1    appointed by Defendants improperly failed to consider whether her mental disability resulted from

2    her physical disability.  Before a decision can be reached regarding Plaintiff's contentions of

3    wrongful termination of benefits, the Court needs to have a basis upon which a rational decision can

4    be made.

5            Accordingly, the matter must be remanded to the Plan Administrator for a reevaluation of

6    Plaintiff's claim in a manner consistent with this Order.  See Saffle v. Sierra Pacific Power Co.

7    Bargaining, 85 F.3d 455, 461 (9th Cir. 1996) (stating that "remand for reevaluation of the merits of a

8    claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a

9    plan, has misconstrued the Plan and applied a wrong standard to a benefits determination").  The

10   primary task on remand will be for the Plan Administrator to commence a new Independent Medical

11   Review by a physician qualified to investigate whether Plaintiff's mental disability resulted from her

12   physical disability.  Defendant shall then articulate the basis of any determination and award benefits

13   accordingly.  However, if Defendants find, based upon the new Independent Medical Review and

14   interpreting the terms of the plan as instructed herein, that benefits are not due to Plaintiff,

15   Defendants shall formally file their determination with this Court for review.

16                                     **VI.  CONCLUSION**

17           The Court GRANTS Plaintiff's Motion for Summary Judgment in Part, DENIES Defendants'

18   Motion for Summary Judgment, and REMANDS the case for determination of Plaintiff's claim for

19   long-term disability benefits in accordance with the findings and conclusions of this Order.  The

20   parties' submissions in support and in opposition to the motions shall be part of the administrative

21   record upon remand.  Defendants shall determine the scope of benefits owed to Plaintiff within 90

22   days of the date of this Order, which is the same amount of time provided for a plan administrator to

23   notify a claimant of a benefits determination under 29 C.F.R. § 2560.503-1(f).

24   //

25

26

27

28                                          21

**United States District Court**
For the Northern District of California

1      The parties shall appear for a case management conference on **August 7, 2006 at 10 a.m.**

2   Should the case resolve, the parties shall notify the Court accordingly and the conference will be

3   vacated.  Pursuant to the Local Rules of this Court, the parties shall file a case management

4   statement no later than ten days before the date of the conference.

5

6   Dated: April 5, 2006                                    _James Ware_____

7                                                            JAMES WARE
                                                             United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Glenn R Kantor gkantor@kantorlaw.net
Krista L. Mitzel kmitzel@seyfarth.com
Lawrence E. Butler lbutler@seyfarth.com

**Dated: April 5, 2006**                          **Richard W. Wieking, Clerk**

                                                    **By:        /s/ JW Chambers**
                                                    **Melissa Peralta**
                                                    **Courtroom Deputy**

**United States District Court**
For the Northern District of California